THE BRISTOL AND PLAINVILLE TRAMWAY COMPANY
*vs*. GEORGE A. EVELINE ET ALS.

First Judicial District, Hartford, May Term, 1915.
THAYER, RORABACK, WHEELER, BEACH and BURPEE, Js.

In an action upon a bond for the faithful performance of a contractor's obligation respecting the construction of a gas-main, the principal issue in the case was whether the contract, upon its face, required the contractor to make and seal the joints of the pipes, as the plaintiff contended, or whether its duty in that respect was fulfilled by furnishing the men to do the work under the supervision and direction of the plaintiff, as the defendants insisted. The contract not only contained no express provision that the contractor should make or seal the joints, but the specifications, which set forth at great length and in minute detail all the work to be done, provided that the contractor should "furnish" the plaintiff company with "a sufficient number of competent mechanics for joint-making." *Held* that it was quite apparent from this clause of the contract that the plaintiff company intended to keep the important matter of joint-making in its own hands and to have it done to its own satisfaction by mechanics furnished to it for that purpose by the contractor, and that the silence of the specifications as to how the joints should be made and sealed was in harmony with this expressed intent; and therefore that the trial court committed no error in nonsuiting the plaintiff, whose only ground of

recovery was the alleged negligence of the contractor in the matter of joint-making.

Upon an appeal from a judgment of nonsuit the plaintiff may challenge the correctness of the ruling which preceded and brought about that result; but if he seeks to review certain rulings upon evidence he should identify the particular one or ones by means of a finding of facts and not rely upon a presentation of the entire evidence to accomplish that purpose.

A written contract may be subsequently modified by agreement of the parties.

Argued May 4th—decided. June 10th, 1915.

ACTION upon a contractor's bond for the due and proper performance of certain work in connection with the excavating, laying, and back-filling of cast iron gas-pipes and their fixtures, brought to the Superior Court in Hartford County where the plaintiff was non-suited in a trial to the court, *Gager, J.*, and from the refusal of the trial court to set aside this judgment the plaintiff appealed. *No error*.

This action is brought against the contractor and surety upon a bond for the faithful performance of a contract between the George A. Eveline Company and the Bristol and Plainville Tramway Company for laying gas-pipes. The complaint alleges that the contractor so negligently performed the work of making and sealing the joints of the pipes, that the plaintiff was obliged to expend some $2,500 in repairing the defective joints; and the breach of the bond alleged is the neglect and refusal of the defendants to repay the same on demand. Except as to the execution of the bond, the demand and the refusal to pay, all of the allegations of the complaint are denied. It is alleged by all the defendants that the contract, as originally executed, was modified by a verbal agreement in respect of the sealing of the joints, and as so modified was fully performed. On the part of the surety it is further alleged that this modification was without notice to it.

The plaintiff's reply denies any change whatever in the original contract except in respect of an immaterial detail, viz: that the joints should be paid for as piecework instead of by the day.

On the trial the defendants interposed, as an objection to evidence, the claim that on the face of the written contract the contractor had not agreed to make the joints, but only to furnish the plaintiff company with competent mechanics for that purpose at an advance of twenty-five cents per day over the wages actually paid. The trial court sustained this claim, and since the plaintiff's pleadings rested its case solely on the bond and contract, the necessary result of this ruling was that the plaintiff was unable to make out a prima facie case of a breach of the condition of the bond. Judgment was rendered as of nonsuit; and from the denial of the plaintiff's motion to set aside the nonsuit this appeal is taken.

The assignments of error relate not only to the refusal of the court to set aside the nonsuit, but also to the ruling of the court as to the interpretation of the contract, and the third and fourth assignments of error are as follows:—

"3. The court erred in excluding evidence of the trade understanding under a contract of this sort. 4. The court erred in excluding evidence that at the time of the doing of this work both parties understood and construed the contract to mean that the contractor assumed the responsibility for the proper sealing of the joints."

The entire evidence is certified in support of the appeal from the refusal of the trial court to set aside the nonsuit, but there is no finding of facts to identify the particular rulings on evidence which are sought to be removed to this court for revision.

*Noble E. Pierce*, for the appellant (plaintiff).

*Bernard F. Gaffney*, for the appellee (defendant Parsons).

*Henry F. Fletcher*, for the appellee (defendant United States Fidelity and Guaranty Company).

BEACH, J.   On the face of this appeal-record the nonsuit was justified, because there is no evidence whatever to support the essential allegations of negligence and of defective workmanship.   The underlying question, however, was whether, on the face of the contract, the plaintiff had any cause of action enforceable by a suit on the bond.   This question having been determined adversely to the plaintiff was decisive of the merits, and might logically have resulted in a judgment for the defendant in the usual form, instead of a judgment as of nonsuit.   But since the nonsuit was based upon the ruling as to the construction of the contract, the correctness of this ruling may be challenged on an appeal from the refusal to set aside the nonsuit (*Dunnett* v. *Thornton*, 73 Conn. 1, 46 Atl. 158), and as the contract itself is made part of the complaint and annexed to it as an exhibit, no finding of fact is necessary in order to bring the ruling before this court for revision.

The third and fourth assignments of error, for exclusion of evidence, stand upon a different footing.   They are not properly before us because not founded upon a finding of fact identifying the rulings appealed from, as required by § 792 of the General Statutes and § 5 of the Rules of this Court (Practice Book, 1908, p. 266).   We have several times held that the certification of the entire evidence as part of the record on appeal is not of itself a sufficient basis for assignment of error in excluding or admitting evidence.   *Dennison* v. *Waterville Cutlery Co.*, 80 Conn. 596, 69 Atl. 1022;

*Cadwell* v. *Canton*, 81 Conn. 288, 70 Atl. 1025; *Summa* v. *Dereskiawicz*, 82 Conn. 547, 74 Atl. 906. This rule applies not only to appeals from a denial of a motion for a new trial on the ground that the verdict was against the evidence, and from a decision setting aside a verdict, but also to appeals from the denial of a motion to set aside a nonsuit. On such appeals the question whether the trial court erred in holding that the plaintiff had not made out a prima facie case is often affected by the rulings of the trial court in excluding evidence offered by the plaintiff for that purpose; and the same reason exists in such appeals as in any others for requiring the rulings on evidence, if appealed from, to be identified by a finding of the trial court. Otherwise the assignments of error may, as they do in this case, amount to an attempted appeal at large from all rulings made in respect of the subject-matter referred to therein, or from all rulings made during the examination of the witness named therein; leaving the selection of the particular rulings appealed from to be made at some subsequent time or to be ascertained by searching the entire evidence.

In this case, however, it happened that the rulings upon evidence are founded upon and involved in the interpretation of the contract, and they will be practically disposed of in determining the question whether the written contract excludes on its face any obligation on the contractor's part to perform the work of making the joints. The contract and accompanying papers annexed to the complaint comprise a notice to contractors, general and particular specifications, a form of proposal for bid, the contract proper, and the bond sued on. The general character of the work is variously entitled in these papers. The specifications are entitled "Specifications for the Construction of a System of Gas Mains for The Bristol & Plainville

Tramway Company," and this title suggests that the specifications were intended to cover a completely finished and jointed system of gas-mains. On the other hand, the bond sued on describes the contract as a contract "for the performance of certain work in connection with the excavating, laying and back-filling cast iron gas-pipe and fixtures therewith," and this suggests with equal force that the contract was not for furnishing a completely finished system of gas-mains. The same inference is to be drawn from the notice to contractors, which was accompanied by the specifications and form of contract, and contains the company's estimate of the quantities of work to be done as follows: "The company's estimate of the quantities of work to be done, by which each of the bids will be compared, is as follows:—

"Trenching, laying, back-filling and re-surfacing
20,000 linear feet four (4) inch cast iron pipe and
    specials;
2,000 linear feet six (6) inch cast iron pipe and spe-
    cials;
4,800 linear feet eight (8) inch cast iron pipe and
    specials;
8,300 linear feet ten (10) inch cast iron pipe and
    specials;
9,000 linear feet twelve (12) inch cast iron pipe and
    specials."

Pursuant to this notice the defendant contractor submitted a proposal to furnish all labor and materials called for by the specifications, for the following sums:—

"1. For laying, back-filling, and excavating trench as required linear feet four (4) inch pipe nine 1/4 cents per ft. (9–1/4). 2. Same linear feet six (6) inch pipe eleven 1/4 cents per ft. (11–1/4). 3. Same linear feet eight (8) inch pipe eleven 3/4 cents per ft. (11–3/4). 4. Same linear feet ten (10) inch pipe twelve 1/4 cents

per ft. (12–1/4).    5. Same linear feet twelve (12) inch pipe fifteen 1/4 cents per ft. (15–1/4).    6. Same linear feet per foot.    7. Rock excavation one dollar and seventy-five cents per cu. yd. ($1.75/100)."

This proposal was accepted and the contract, under the heading of "Prices and Payments," provides for the contractor's compensation as follows:—

"Excavating, laying, and back-filling cast iron gas pipe and specials, drips, and gates,

20,000 linear feet four (4) inch per foot 9 1/4 cents $1,850.00;

2,000 linear feet six (6) inch per foot 11 1/4 cents $225.00;

4,800 linear feet eight (8) inch per foot 11 3/4 cents $564.00;

8,300 linear feet ten (10) inch per foot 12 1/4 cents $1,016.75;

9,000 linear feet twelve (12) inch per foot 15 1/4 cents $1,372.50."

In all of these papers there is constant reference to the specifications, and in the specifications the only direct reference to joint-making is contained in the section entitled "Pipe Laying," of which the material portions are as follows:—

"Pipe laying shall be so conducted as to preclude the possibility of cracking any pipe in placing the same in the trench. Each pipe must be placed well home against the preceding one. All pipe cutting and fitting must be done without extra charge outside of the price per foot for laying the same.

"The contractor will furnish the company at an advance of twenty-five cents (25c) per man per day of ten (10) hours over the wages actually paid a sufficient number of competent mechanics for joint-making. Should rock cutting or other unforeseen hindrances prevent the employment of the entire time of such

men in joint-making, the contractor will employ them in other parts of the work and charge the company with the actual time only spent in joint-making. The labor of adjusting valves, connecting drips and setting curb boxes shall be performed by these men at the expense of the company, and the contractor shall assume all responsibility for such work.

"The bed of the pipe must be even, true, and uniform, so that the pipe will bear equally upon it for the whole of its length, and this result must be reached by carefully bottoming out the trenches to bring them to the proper grade. Sufficiently large holes shall be dug to leave the bell of each pipe free and not resting on the ground at any point, and also to afford the necessary room for caulking the joint.

"At the time of laying, the bell and spigots shall be truly adjusted so as to give a uniform lead or cement space all around.

"The pipes shall be so placed in the trenches that the line be kept straight and at an even gradient.

"The pipes are to be swabbed clean and free from dirt and rubbish before laying, and each time of stopping work, the end of the pipe must be carefully plugged and closed to exclude animals, dirt and water. All dead ends of pipes or special castings must be permanently closed by inserting a plug or cap."

Other portions of the specifications bearing indirectly on the subject of joint-making are those relating to the general scope of the work, and to the testing of joints, which are:—

## "TOOLS AND APPLIANCES.

"The contractor must furnish all labor, materials (other than pipe, special castings, valves and valve-boxes, drips and drip-boxes, lead, cement and yarn) needed for the work and all appliances necessary to

lay the pipe in accordance with these specifications and in a thoroughly first class and workmanlike manner.

## "TESTING.

"All mains shall be carefully tested for leakage by filling same with air under pressure before back-filling trenches. As far as possible, the mains shall be laid in sections, permitting the use of hand pumps to supply the air under pressure for testing. For this purpose, the company will supply suitable pumps and necessary fittings. The contractor will supply labor to operate the pump in raising pressure to not more than five (5) pounds per square inch, as may be directed by the company. All special joints required to be made and removed for the purpose of testing will be executed by the contractor at his own expense. All joints shall be permitted to stand uncovered for at least twelve hours (12) after making before testing, unless directed to the contrary by the company.

"An employee of the company shall be present at every test. The necessary labor for locating leakage, by going over the work with soapsuds, or by some other method as may be directed by the said company's employee and for correcting same, shall be furnished by the contractor. No test shall be considered complete until satisfactory to the company.

"When a defective casting is developed by any test, the cause for which is clearly the result of improper material or workmanship employed by the maker and not discoverable prior to placing in the trench, same shall be replaced by the contractor. The cost of this replacing shall be accurately taken by the company and an equal allowance be made the contractor; this allowance to include only actual expenses for labor and materials in executing the replacement."

There are also some general provisions in the contract

capable of a more remote bearing upon the subject, such as that which embraces the obligation of the contractor to make good any defect in the work or materials within one year after the completion of the work; but we think these general provisions were not intended to impose any obligation on the contractor in respect of work which he had not otherwise agreed to perform by the terms of the contract and specifications.

It must be admitted that on the face of these papers there is no express undertaking on the part of the contractor to make or seal the joints of these gas-pipes; and in view of the particularity of the contract and specifications, which cover over twenty printed pages of the appeal-record, this fact alone would seem to be enough to justify the ruling of the court; for it is practically a contradiction of the terms of so carefully prepared and comprehensive a writing, to attempt to add another term to it by implication or by parol testimony. Especially is this so when the written contract fully covers the particular subject-matter in question by the provision that the contractor will furnish the company with competent mechanics for joint-making. This purports to be a complete disposition of the contractor's obligation as to joint-making, and there is nothing obscure or ambiguous about it. The contract, by reference to the specifications, declares that the contractor shall do certain other work which is described in great detail, but when it comes to the joint-making the stated obligation of the contractor is to furnish the Tramway Company with competent mechanics for joint-making, and to keep them otherwise employed when not wanted for that purpose. The plain meaning of this provision is that the Tramway Company intended to keep this most important matter of joint-making in its own hands and have it done by day's work rather than by contract, and to have it done in its own way and to its own

satisfaction by mechanics furnished to it for that purpose by the contractor. If there were any doubt upon that point it would be resolved by observing that the specifications are entirely silent as to the details of joint-making. They are precise as to the cutting, fitting, and laying of the pipe, and as to the preparation of a true and uniform bed, the digging of holes to leave the bells of the pipes free and afford room for caulking the joints, and the adjustment of bell and spigot so as to give a uniform space for lead or cement all around. The contractor is thus required, by the most painstaking and particular language, to attend to every detail of laying the pipe down to the point where it is ready for the making of the joints; but as to this necessary and important operation the specifications are silent. Nothing is said as to whether the joints shall be made with lead or cement, or in what manner the operation of caulking the joints shall be performed, or that when tested (as they must necessarily be whether made by the company or by the contractor) they shall be replaced by the contractor if found defective. These specifications accompanied the original notice to contractors, and are referred to therein and in the form of proposals or bids to be executed by the contractor; and in view of the particularity of the specifications in respect of other matters, it is not conceivable that the contractor was expected to include in his bid the cost of joint-making, which is not only expensive in itself but involves a large responsibility for the future, without being informed by the specifications what kind of joints must be made, or in what manner he would be required to make them. The suggestion that the Tramway Company may have intended to leave the whole subject of joint-making to the discretion of the contractor is refuted, not only by the exactness of the specifications in respect of comparatively unimportant

Bristol & Plainville Tramway Co. *v.* Eveline.

details, but by the express provision that the contractor should furnish the company with competent mechanics for joint-making; a provision which, taken in connection with the absence of any specifications on that subject, necessarily indicates that the company intended to reserve the control of joint-making to itself.

The other provisions of the contract are consistent with this plainly expressed intent. There is nothing in the fact that the contractor is to supply labor to make the special joints required for the purpose of testing the mains for leakage, which is inconsistent therewith; and it is to be noted that, although the contractor is required to replace any defective castings developed by such tests, he is not required to replace or repair any defective joints developed by such tests.

We conclude that the written contract excludes, upon its face, any obligation on the part of the contractor to make or seal the joints of the gas-mains. It was of course competent for the contractor and the company to modify the contract by a subsequent agreement between themselves, but this action is on the bond, and not on the contract so modified; and the complaint contains no allegation that the written contract does not express the true intent of the parties as to the point in controversy. On these pleadings the trial court did not err in holding that upon the face of the written contract the Tramway Company was to do its own joint making with mechanics furnished for that purpose by the contractor, and that the contract was in that respect plain and unambiguous.

There is no error.

In this opinion the other judges concurred.